UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

GERALD A. MONTAQUE

                    Plaintiff,

        v.                                          **DECISION AND ORDER**
                                                    **07-CV-0749 (VEB)**
MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.


## I. Introduction

        Plaintiff Gerald A. Montaque challenges an Administrative Law Judge's

("ALJ") determination that he is entitled to neither disability insurance benefits

("DIB"), nor Supplemental Security Income ("SSI"), under the Social Security Act

("the Act").  Plaintiff alleges he has been disabled since August 9, 2000, because

of pain and limitations from a left rotator cuff repair, insulin-dependent diabetes

mellitus, numbness and tingling in his limbs, pain in his upper right extremity, left

elbow pain, bilateral knee pain, light-headedness, and blurry vision.  Plaintiff met

the disability insured status requirements of the Act through March 31, 2006.

## II. Background

        Plaintiff filed an application for DIB on November 29, 2004, and an

application for SSI on December 13, 2004.  On both applications he alleged an

onset of disability date of August 9, 2000[1].  His applications were denied initially

---

[1] Plaintiff filed a prior application for DIB on April 9, 2001, alleging an onset of disability of August
9, 2000.  This claim was denied at the hearing level in a decision dated August 7, 2002, and was
upheld by the Appeals Council on November 19, 2004.  The ALJ declined to re-open the

and, under the prototype model of handling claims without requiring a reconsideration step, Plaintiff was permitted to appeal directly to the ALJ.  See 65 Fed. Reg. 81553 (Dec. 26, 2000).   Pursuant to Plaintiff's request, an administrative hearing was held on April 20, 2006, before ALJ J. Michael Brounoff, at which time Plaintiff and his attorney appeared.  The ALJ considered the case *de novo*, and on November 15, 2006, issued a decision finding that Plaintiff was not disabled.  On May 18, 2007, the Appeals Council denied Plaintiff's request for review.

On July 18, 2007, Plaintiff filed a Civil Complaint challenging Defendant's final decision and requesting the Court to review the decision of the ALJ pursuant to Section 205(g) and 1631(c) (3) of the Act, modify the decision of Defendant, and grant DIB benefits to Plaintiff.[2]  The Defendant filed an answer to Plaintiff's complaint on November 1, 2007, requesting the Court to dismiss Plaintiff's complaint.  Plaintiff submitted a Memorandum of Law ("Plaintiff's Brief") on February 11, 2008.  On March 17, 2008, Defendant filed a Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings ("Defendant's Brief")[3] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  After full briefing, the Court deemed oral argument unnecessary and took the motions under advisement.

---

application, and under the doctrine of *res judicata*, determined that Plaintiff's DIB claim would be considered only after August 7, 2002, through his date last insured of March 31, 2006.
[2] The ALJ's November 15, 2006 decision became the Commissioner's final decision in this case when the Appeals Council denied Plaintiff's request for review.
[3] Although no motion for judgment on the pleadings was filed, the moving party was excused from such filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the proceeding as if both parties had accompanied their briefs with a motion for judgment on the pleadings…"

For the reasons set forth below, this Court finds no reversible error and finds that substantial evidence supports the ALJ's decision.  Thus, the Court affirms the decision of the Commissioner.

### III.  Discussion

**A.  Legal Standard and Scope of Review:**

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled.  See 42 U.S.C. § 405(g), 1383 (c)(3); Wagner v. Sec'y of Health and Human Servs., 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will only be reversed if it is not supported by substantial evidence or there has been a legal error. See  Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979). "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).  Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).  If supported by

substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]."  Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review."  Valente v. Sec'y of Health and Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

The Commissioner has established a five-step sequential evaluation process[4] to determine whether an individual is disabled as defined under the Social Security Act.  See 20 C.F.R. § 404.1520, 416.920.  The United States Supreme Court recognized the validity of this analysis in Bowen v. Yuckert, 482

---

[4]        This five-step process is detailed below:

First, the [Commissioner] considers whether the claimant is currently engaged substantial gainful activity.  If he is not, the [Commissioner]next considers whether the claimant has a "severe impairment" which
significantly limits his physical or mental ability to do basic work active-ties.  If the claimant has such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment
which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work
experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment,
the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); see also Rosa v. Callahan, 168 F.3d 72,77 (2d Cir. 1999); 20 C.F.R. § 404.1520.

U.S. 137, 140-142, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987), and it

remains the proper approach for analyzing whether a claimant is disabled.

While the claimant has the burden of proof as to the first four steps, the

Commissioner has the burden of proof on the fifth and final step.  See Bowen,

482 U.S. at 146 n.5; Ferraris v. Heckler, 728 F.2d 582 (2d Cir. 1984).  The final

step of this inquiry is, in turn, divided into two parts.  First, the Commissioner

must assess the claimant's job qualifications by considering his physical ability,

age, education, and work experience.  Second, the Commissioner must

determine whether jobs exist in the national economy that a person having the

claimant's qualifications could perform.  See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R.

§ 404.1520(f); Heckler v. Campbell, 461 U.S. 458, 460, 103 S. Ct. 1952, 1954,

76 L. Ed. 2d 66 (1983).

## B. Analysis

### 1.   Commissioner's Decision

In this case, the ALJ made the following findings with regard to factual

information as well as the five-step process set forth above: (1) Plaintiff met the

insured status requirements of the Social Security Act through March 31, 2006

(R. at 19);[5]  (2) Plaintiff has not engaged in substantial gainful activity since

August 8, 2002, the alleged onset date (20 C.F.R. §§ 404.1520(b), 404.1571

*et.seq.,* 416.920(b) and 416.971 *et. seq.*) (R. at 19); (3) Plaintiff has the following

severe combination of impairments: status post resection of the distal clavicle

and acromion left shoulder (1998), status post left rotator cuff repair and distal

clavicle resection left shoulder (9/5/2001), right elbow degenerative changes and

---

[5] Citations to the underlying administrative are designated as "R."

chronic obstructive pulmonary disease with a moderate restriction and status post cannabis use (20 C.F.R. §§ 404.1520(c) and 416.920(c)) (R. at 19); (4) Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926) (R. at 20); (5) Plaintiff has the residual functional capacity during the course of an eight-hour workday to lift/carry and push/pull up to 10 pounds occasionally with the left upper extremity and 20 pounds overall without right upper extremity restrictions, to stand and/or walk up to six hours and sit for up to six hours, and should avoid overhead and repetitive reaching with the upper left extremity and avoid exposure to respiratory irritants (R. at 21); (6) Plaintiff is unable to perform his past relevant work (20 C.F.R. §§ 404.1565 and 416.965) (R. at 26); (7) Plaintiff was born on December 6, 1960 and was 41 years old on the alleged disability onset date (August 8, 2002), which is defined as a younger individual age 18-44 (20 C.F.R. §§ 404.1563 and 416.963) (R. at 26); (8) Plaintiff has a limited education with formal schooling completed only through the 9th grade.  He testified that he was in special education some of those years, but is able to speak, read, and write in English and do basic addition, subtraction, and multiplication (20 C.F.R. §§ 404.1564 and 416.964) (R. at 26); (9) Transferability of job skills is not an issue because Plaintiff's past work is unskilled (20 C.F.R. §§ 404.1568 and 416. 968) (R. at 26); (10) Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that

Plaintiff can perform (20 C.F.R. §§ 404.1560(c), 404.1566, 416.960(c) and 416.966) (R. at 26); and (11) Plaintiff has not been under a disability, as defined in the Social Security Act, from August 9, 2000, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)) (R. at 27).  Ultimately, the ALJ determined Plaintiff was entitled to neither a period of disability and disability insurance benefits as set forth in sections 216(i) and 223(d) of the Social Security Act, nor supplemental security income as set forth under section 1614(a)(3)(A) of the Act  (R. at 27-28).

### 2.      Plaintiff's Claims

Plaintiff challenges the decision of the ALJ on the basis that it is not supported by the substantial evidence of record.  Specifically, Plaintiff alleges (a) the ALJ ignored the opinion of Plaintiff's treating physician that Plaintiff was restricted from all work activity because of left shoulder pain and diabetes, (b) the ALJ ignored relevant evidence that Plaintiff had patellofemoral arthritis in both knees, and moderate degenerative joint disease in his right knee, and failed to properly assess these impairments in the residual functional capacity assessment, (c) the ALJ erroneously discounted Plaintiff's credibility, (d) the ALJ erroneously discounted the assessment of State agency examining physician, Dr. Myra Shayevitz, that Plaintiff was limited to less than the full range of sedentary work[6], and (e) the ALJ failed in his burden at step five of the sequential evaluation because (i) he did not consider all of Plaintiff's exertional and non-

---

[6] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  See 20 C.F.R. § 404.1567.

exertional limitations when considering the occupational base that might be available to Plaintiff, and (ii) the ALJ erroneously relied on the Grids, absent other vocational evidence, to deny benefits to Plaintiff.  Plaintiff asserts that the ALJ's determination that he is "not disabled" at step five in the sequential evaluation must be reversed as it is not supported by the substantial evidence in the record. See Plaintiff's Brief, pp. 1, 12-24.

### a.     The ALJ Properly Considered the Opinion of Plaintiff's Treating Physician

Plaintiff's first challenge to the ALJ's decision is that he failed to follow the treating physician rule by ignoring the opinion of Plaintiff's treating physician, Dr. Harry Black, that Plaintiff was restricted from all work activity because of left shoulder pain, diabetes, and the ability to walk and stand for less than two hours in an eight-hour workday (R. at 158-159, 184-185, 208, 214-217).  Plaintiff claims Dr. Black's opinion should have been given controlling weight as he was Plaintiff's long-time treating physician and his opinion is consistent with the opinions of other providers who examined or treated Plaintiff.  See Plaintiff's Brief, 15-18.  The Commissioner argues that the ALJ, as a trier of fact, properly evaluated the medical opinion of Dr. Black, and his decision not to give Dr. Black's opinion controlling weight is consistent with the record as a whole.  See Defendant's Brief, pp. 13-18.

According to the "treating physician's rule,"[7] the ALJ must give controlling weight to the treating physician's opinion when the opinion is well-supported by

---

[7] "The 'treating physician's rule' is a series of regulations set forth by the Commissioner in 20 C.F.R. SS 404.1527 detailing the weight to be accorded a treating physician's opinion." de

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2); see also Green-Younger v. Barnhart, No. 02-6133, 2003 WL 21545097, at *6 (2d Cir. July 10, 2003); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000).

Even if a treating physician's opinion is deemed not to be deserving of controlling weight, an ALJ may nonetheless give it "extra weight" under certain circumstances.  Under  C.F.R. § 404.1527(d)(1)-(6), the ALJ should consider the following factors when determining the proper weight to afford the treating physician's opinion if it is not entitled to controlling weight: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability of opinion, (4) consistency, (5) specialization of the treating physician, and (6) other factors that are brought to the attention of the court.  See de Roman, 2003 WL 21511160, at *9 (citing C.F.R. § 404.1527(d)(2); see also Shaw, 221 F.3d at 134; Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

Having reviewed the evidence at issue, this Court detects no reversible error in the ALJ's treatment of the opinion of Plaintiff's treating physician, Dr. Black.  Rather, the ALJ's decision reflects his extensive evaluation of all the medical evidence in the record developed from the date of Plaintiff's alleged disability on August 9, 2000, through the date of the ALJ's decision on November 15, 2006 (R. at 16-28).  The medical evidence includes treatment notes,

---

Roman v. Barnhart, No.03-Civ.0075(RCC)(AJP), 2003 WL 21511160, at *9 (S.D.N.Y. July 2, 2003).

evaluations of Plaintiff's progress, and test results (R. at 112-238).  The opinion of Dr. Black that Plaintiff is unable to perform the exertional and non-exertional requirements of even sedentary work because of limitations from left shoulder degenerative disease, right elbow arthritis, insulin-dependent diabetes and other physical limitations is not supported by the evidence of record (R. at 158-159, 184-185, 208, 214-217).

Plaintiff's medical record documents that he has a long-term treatment relationship with Dr. Black dating back to December 1997 (R. at 176).  Dr. Black examines Plaintiff on a regular basis and treats him for miscellaneous ailments, including respiratory and sinus infections (R. at 153, 154, 155, 156, 161, 177, 182, 183, 186, 187, 188, 205).  However, the record reflects that while Dr. Black frequently notes Plaintiff's complaints pertaining to orthopedic pain and diabetes, these conditions are regularly treated by specialists (R. at 112, 113, 114, 115, 116, 117, 118, 120, 121, 124-125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 138, 139, 140, 141, 142, 143, 144, 145, 147, 148, 149, 151-152, 174, 176, 177, 178-179, 180, 189, 190, 191, 193-194, 195, 196-197, 198-199, 200-201).

As an example, Plaintiff complained to Dr. Black of pain in his left shoulder in June 2000 (R. at 183).  Dr. Black did not record a cause for Plaintiff's complaint, but referred Plaintiff to an orthopedic specialist, Dr. John Mosher (R. at 113).  Dr. Mosher noted Plaintiff's chief complaint as "weakness mainly in the left shoulder area."  Id.  An x-ray revealed early evidence of arthritis in the

glenohumeral joint[8].  Id.  Plaintiff requested an evaluation for disability-related

purposes, but Dr. Mosher suggested a course of physical therapy to strengthen

the shoulder area.  Id.  On August 9, 2000, Plaintiff followed up with Dr. Mosher.

Id.  He reported continuing pain in his left shoulder.  Id.  Plaintiff told Dr. Mosher

he had been examined by an independent medical examiner for his insurance

company, and the insurance company would not authorize physical therapy[9].  Id.

He requested that Dr. Mosher take him out of work.  Id.

Plaintiff was given a second opinion examination by another orthopedic

specialist, Dr. Daniel Carr, on August 15, 2000 (R. at 114).  Dr. Carr's

examination revealed unremarkable results.  Id.  Plaintiff had no pain with

impingement testing, cross-arm adduction, and internal rotation behind his back.

Id.  He had good rotator cuff strength, and only mildly diminished strength on his

left side as compared to his right side[10].  Id.  Plaintiff had negative Speed's

testing[11] and negative Yergason's testing[12], with no shoulder instability.  Id.  The

doctor noted Plaintiff's primary complaint was "fatiguability" in his left shoulder.

Id.  Dr. Carr recommended an independent exercise program, rather than

---

[8] The glenohumeral joint, or shoulder joint, is a flexible ball-and-socket joint formed by the junction of the humerus and the scapula.  See
http:www.medterms.com/script/main/art.asp?articlekey=9059.
[9] Notes from the independent medical examiner are not contained in Plaintiff's record.
References to the examination are contained in Dr. Mosher's notes.
[10] Plaintiff is right-hand dominant.
[11] Speed's test is used to examine the proximal tendon of the long head of the biceps.  The test is performed by having the patient forward flex the shoulder 60 degrees against resistance while maintaining the elbow in extension and the forearm in supination.  Tenderness in the bicipital groove dictates bicipital tendonitis.  See http:www.wheelessonline.com.
[12] Yergason's test is used to examine biceps tendon stability.  The test is performed by having the patient fully flex the elbow with the forearm in supination.  The orthopedist externally rotates and presses downward on the flexed elbow.  A positive examination elicits pain.  See
http:www.wheelessonline.com.

physical therapy, to improve Plaintiff's left shoulder strength.  Id.  Dr. Carr opined

there was no contraindication to Plaintiff doing his regular job.  Id.

Plaintiff continued to complain to Dr. Mosher of pain in his left shoulder (R.

at 115, 116).  Dr. Mosher recommended Plaintiff have an MRI examination of his

left shoulder, followed by a consultation with another orthopedic specialist, Dr.

John Cannizzaro (R. at 116, 117, 118-119).  The MRI revealed a large partial

thickness tear of the undersurface of the supraspinatus tendon (R. at 117).  On

September 5, 2001, Plaintiff underwent left shoulder arthroscopy, lateral

debridement, decompression, and open left rotator cuff repair (R. at 124-125).

During Plaintiff's post-operative visits with Dr. Cannizzaro, the doctor assessed

Plaintiff was doing well after surgery despite the fact that he continued to

complain of left shoulder pain and stiffness (R. at 126-128).  On September 12,

2002, approximately one year after Plaintiff's left shoulder rotator cuff repair, he

still complained of shoulder pain (R. at 133).  Dr. Cannizzaro recommended an

MRI arthrogram of Plaintiff's left shoulder.  Id.  Plaintiff underwent the

recommended testing of his shoulder on October 21, 2002 (R. at 147).  The test

showed no evidence of a rotator cuff tear, but Plaintiff had fluid within the bursa

consistent with bursitis.  Id.  Dr. Cannizzaro examined Plaintiff on October 31,

2002 (R. at 134).  The doctor noted mild atrophy in his left shoulder, and Plaintiff

complained of pain with range of motion and rotation testing.  Id.  Dr. Cannizzaro

opined Plaintiff had reached his maximum medical improvement and estimated

Plaintiff's scheduled loss of use of his left shoulder secondary to atrophy and

bony resection was 60 percent.  Id.  He recommended Plaintiff continue with his rehabilitation program and follow up with the doctor as needed.  Id.

On November 13, 2003, approximately one year after Plaintiff's examination by Dr. Cannizzaro, he was examined by Dr. Cannizzaro's physician's assistant, Matthew Burnett (R. at 137).  Plaintiff complained of left shoulder pain.  Id.  However, a physical examination of Plaintiff's shoulder showed good range of motion and stability.  Id.  His strength on forward flexion was 4+/5 with some pain, abduction was 4+/5 with some pain, and internal/external rotation was 5/5 without pain.  Id.  Supraspinatus testing was 4-/5.  Plaintiff had full range of motion and strength in his right shoulder.  Id.  Mr. Burnett recommended physical therapy to increase Plaintiff's left shoulder strength.  Id.

Eleven months after the examination by Mr. Burnett, on October 7, 2004, Plaintiff complained of pain in both shoulders and was examined again by Dr. Cannizzaro (R. at 141).  The examination revealed good range of motion in both shoulders, with good strength and stability, but with tenderness in the area of the rotator cuff.  Id.  Dr. Cannizzaro opined Plaintiff's left shoulder was "doing fair" status post rotator cuff repair and decompression, and that he had tendinitis in his right rotator cuff.  Id.  The doctor recommended physical therapy and re-examination in two months.  Id.

Plaintiff was re-examined by Dr. Cannizzaro on February 14, 2005 (R. at 143).  Plaintiff complained of tenderness in his left shoulder and the doctor recommended continued physical therapy and a steroid injection.  Id.

On March 3, 3005, Plaintiff followed up with Dr. Cannizzaro (R. at 144). He reported improvement in his shoulder with stretching exercises.  Id.  Physical examination revealed a "fair" range of motion with good stability, and left shoulder strength at 4/5 with pain.  Id.  Dr. Cannizzaro recommended physical therapy and follow up as needed.  Id.  This was Plaintiff's last visit with Dr. Cannizzaro although he continued with physical therapy for his left shoulder at least until April 2006 (R. at 173, 218-221).

With respect to Dr. Black's assessment that limitations in Plaintiff's right elbow rendered him unable to perform the demands of any work, the Court notes that Plaintiff first complained to Dr. Cannizzaro about "locking" in his right elbow on January 8, 2004 (R. at 138-139).  An MRI revealed a capitellar lesion[13].  Dr. Cannizzaro recommended observation.  Id.  On April 22, 2004, Plaintiff met with Dr. Cannizzaro again and requested right elbow arthroscopy and debridement (R. at 140).  It is unclear from Plaintiff's record if this surgery was performed, but Dr. Cannizzaro noted no further complaints from Plaintiff about a problem with his right elbow.

With respect to Dr. Black's opinion that Plaintiff was able to stand and walk for less than two hours in an eight-hour workday, the Court notes that Plaintiff did undergo successful vein stripping of varicose veins in his legs in June 2002 (R. at 190, 191, 214).  In September 2002, when Plaintiff complained of aching in his legs in September 2002, his surgeon, Dr. Lawrence Semel, recommended Plaintiff use compression stockings and take anti-inflammatories

---

[13] A lesion on the knob-like protrusion (capitella) of the humerus.  See http:www.merriam-webster.com/medical/capitella.

(R. at 191).  Plaintiff was later examined by a nurse practitioner, Catherine
O'Hara, at the Joslyn Clinic, on February 22, 2006 (R. at 200-201).  At that time,
he reported no joint or muscular pain other than complaining that "his legs ache
at times" (R. at 200).

The ALJ's decision that Plaintiff was not under a disability caused by
limitations of his musculoskeletal system is further supported by a physical
examination by State agency physician, Dr. Berton Shayevitz, performed on
January 5, 2005 (R. at 164-166).  Dr. Shayevitz observed that Plaintiff had a
normal gait and could walk on his heels and toes without difficulty (R. at 165).
Plaintiff's squat was full and his station was normal.  Id.  He needed no help
changing his clothing for the examination, was able to get on and off the
examination table without assistance, and was able to rise from a chair without
difficulty.  Id.  Plaintiff's hand and finger dexterity were intact and his grip strength
was full.  Id.  The examination of Plaintiff's cervical spine was unremarkable.  Id.
Plaintiff had full range of motion in his shoulders bilaterally, and full range of
motion in his elbows, forearms and wrists.  Id.  His strength was 5/5 in the
proximal and distal muscles, with no muscle atrophy or sensory abnormality.  Id.
The examination of Plaintiff's thoracic and lumbar spine was unremarkable (R. at
166).  He exhibited full spinal flexion and extension, without spinal or paraspinal
tenderness.  Id.  His straight-leg raising test was negative bilaterally[14].  Id.  In his
lower extremities, Plaintiff had full range of motion in his hips, knees and ankles

---

[14] The straight leg raise test ("SLR") is used to detect nerve root pressure, tension or irritation. A
positive SLR requires the reproduction of pain at an elevation of less than 60 degrees. A positive
SLR is said to be the most important indication of nerve root pressure. Andersson and McNeill,
Lumbar Spine Syndromes, 78-79 (Springer-Verlag Wein, 1989).

bilaterally.  Id.  Strength tests were 5/5 in the proximal and distal muscles with no

evidence of atrophy.  Id.  Reflexes were physiologic and equal.  Id.  Dr. Shayevitz

noted a slightly palpable patellofemoral clicking with flexion and extension of both

knees and opined Plaintiff had early arthritis in his knees.  Id.  In his medical

source statement, Dr. Shayevitz stated that after two shoulder surgeries, Plaintiff

was moderately limited in the use of his left arm and shoulder and should not

engage in work that would require moderate to heavy repetitive lifting, pushing,

pulling, and reaching with his left arm.  Id.  The doctor noted no other physical

limitations for Plaintiff, except that he needed to take his insulin on schedule.  Id.

        With respect to a disability caused by Plaintiff's insulin-dependent

diabetes, his medical records show that from December 2003 through February

2006, his diabetes has been under good control (R. at 155, 161, 174, 188, 196-

197, 198-199, 205, 206, 200-201).  A physical examination performed on

February 22, 2006, revealed normal results without evidence of lesions at

Plaintiff's injection sites or on his feet (R. at 200-201).  Plaintiff reported that he

had regular eye examinations and no retinopathy (R. at 200).  He told nurse

practitioner O'Hara that while his legs ached at times, he had no other pain.  Id.

        While Plaintiff argues that Dr. Black's opinion that Plaintiff is under a

disability from his left shoulder pain and insulin-dependent diabetes is supported

by the records of other medical providers, this clearly is not the case.  See

Plaintiff's Brief, pp. 16-18.  The very conditions that Dr. Black opines are

disabling are ailments that have been regularly treated by specialists whose

records suggest Plaintiff's left shoulder impairment and diabetes are not totally

disabling.  As an example, Dr. Cannizzaro stated Plaintiff had reached his maximum medical improvement after his left rotator cuff repair and shoulder decompression in October 2002 (R. at 134).  For the purpose of Plaintiff's worker's compensation claim, the doctor estimated Plaintiff's scheduled loss of use of his left shoulder secondary to atrophy and bony resection was 60 percent. Id.  Dr. Cannizzaro's records reflect that he thought Plaintiff had a partial disability after his left shoulder surgery.  Id.  However, to be disabled under the Act, a claimant must be totally disabled such that he or she cannot perform any substantial gainful activity.  See 42 U.S.C. § 423(d); see also Stephens v. Heckler, 766 F.2d 284 (7th Cir. 1985).  ("A person with a partial disability for purposes of workers' compensation is "not disabled" under the Social Security Act, and even a person entitled to collect substantial damages because he cannot find any employment may be deemed "not disabled.""); Little v. Richardson, 471 F.2d 715, 716 (9th Cir. 1973).  ("On this contention of appellant, the District Court ruled: ""It is obvious that reasonable men could differ as to plaintiff's disability in December, 1962. Reasonable men did, in fact, differ herein. Given that the State decision is in no way binding on defendants, and given that both agencies herein have had the same evidence before them, the failure to give more weight to the State findings is not clear 'error on the face of the record.'"  We agree.").

Further, Dr. Black's opinion with respect to Plaintiff being disabled by his insulin-dependent diabetes is not supported by, or consistent with, any other medical provider records.  As noted above, Plaintiff was compliant with his

diabetes treatment plan, his condition was under good control, and he suffered

no disabling consequences from his diabetes during the time frame relevant to

his claim (R. at 155, 161, 174, 188, 196-197, 198-199, 205, 206, 200-201).

Dr. Black's opinion that Plaintiff was unable to walk or stand for more than

two hours in an eight-hour workday is inconsistent with the reports from Dr.

Semel, who performed the surgery that stripped the varicose veins from Plaintiff's

legs (R. at 189-191), It is also inconsistent with the examination results of Dr.

Berton Shayevitz, who found that with respect to Plaintiff's lower extremities, he

had no abnormalities except for early patellofemoral arthritis in his knees (R. at

166).  Moreover, the severe limitations on Plaintiff's activities proposed by Dr.

Black are inconsistent with Plaintiff's own reports of his activities of daily living,

which include housework, shopping, walking, attending church several times

each week, singing in the church choir on a regular basis, and performing

pastoral duties (R. at 59-62, 164, 281).

Thus, it is clear from the record that the ALJ did not ignore, or disregard,

the medical records and opinion of Plaintiff's treating physicians, Drs. Black,

Cannizzaro, and Semel, and substitute his lay opinion for that of competent

medical evidence.  Instead, the ALJ considered the opinion of Dr. Black, but

found his highly restrictive assessment of Plaintiff's capabilities was unsupported

by medically acceptable clinical and laboratory diagnostic techniques, and

inconsistent with the records supplied by other treating and examining sources

(R. at 22).  The ALJ gave great weight to the opinions of treating orthopedic

physician, Dr. Cannizzaro, and examining State agency physician, Dr.

Shayevitz, as these opinions were supported by objective medical evidence and by Plaintiff's activities of daily living (R. at 21-26).

It is well settled that an ALJ is entitled to rely upon the opinions of examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability.  See 20 C.F.R. §§ 404.1512(b)(6), 404.1513(c), 404.1527(f)(2), 416.912(b)(6), 416.913(c), and 416.927(f)(2); see also Leach ex. Rel. Murray v. Barnhart, No. 02 Civ. 3561, 2004 WL 99935, at 9 (S.D.N.Y. Jan. 22, 2004) ("State agency physicians are qualified as experts in the evaluation of medical issues in disability claims.  As such, their opinions may constitute substantial evidence if they are consistent with the record as a whole.")  Such reliance is particularly appropriate where, as here, the opinion of the State agency physician is supported by the weight of the record evidence, including the medical findings of Plaintiff's treating physicians, including Dr. Cannizzaro, Dr. Semel, and the physicians at the Joslyn Clinic. Further, it is the sole responsibility of the ALJ to weigh all medical evidence and resolve any material conflicts in the record.  See Richardson v. Perales, 402 U.S. 389, 399, 91 S. Ct. 1420, 1426, 28 L. Ed. 2d 842 (1971).  Thus, the Court finds that the ALJ carefully reviewed and acknowledged the medical evidence and opinions contained in Plaintiff's record, including the Medical Source Statement of Ability to Do Work-Related Activities (Physical) prepared by Dr. Black, gave proper weight to the opinions of the treating and examining physicians, and based his finding about Plaintiff's residual functional capacity on the totality of evidence available to him on the date of his decision.

**b.    The ALJ Properly Considered the Evidence of Plaintiff's Patellofemoral Arthritis in Both Knees, and Degenerative Joint Disease in His Right Knee When Assessing His Residual Functional Capacity**

Plaintiff's second challenge to the ALJ's decision is that, when assessing Plaintiff's residual functional capacity, the ALJ failed to consider evidence of Plaintiff's patellofemoral arthritis in both knees, and moderate degenerative joint disease in his right knee, and to evaluate Plaintiff's knee problems along with his other impairments, as required by 20 C.F.R. § 404.1545(e).  See Plaintiff's Brief, pp. 12-18.  The Defendant argues that although Plaintiff complained of knee pain, x-ray reports showed only moderate degenerative joint disease in his right knee, and unremarkable results in his left knee.  See Defendant's Brief, p. 20. Other than "a slight palpable patellofemoral clicking with flexion and extension of both knees," physical examinations of Plaintiff's knees revealed normal results, and Plaintiff told the ALJ he had received no treatment for knee problems (R. at 166, 279).  Id.  Thus, Defendant asserts the ALJ reasonably concluded that Plaintiff's knee problems, either alone or in combination with his other impairments, were not disabling and would not interfere with Plaintiff performing the requirements of a significant range of light work.  Id.

From the information contained in the ALJ's decision, it is clear to the Court the ALJ considered Plaintiff's complaints of pain in his knees, as well as the medical evidence documenting a problem with Plaintiff's knees, and the ALJ properly concluded that Plaintiff's patellofemoral arthritis and moderate joint degenerative disease in his right knee, even in combination with his severe left shoulder impairment, right elbow degenerative changes, chronic obstructive

pulmonary disease, and insulin-dependent diabetes, did not render Plaintiff disabled within the meaning of the Act.

As an example, the ALJ noted in his decision that Plaintiff complained of bilateral knee pain (R. at 24).  However, on two separate occasions, State agency physicians Drs. Berton Shayevitz and Myra Shayevitz thoroughly examined Plaintiff's knees and lower extremities and recorded benign results (R. at 23-24, 164-166, 222-227).  The examination records of the State agency physicians are consistent with the examination records of Plaintiff's treating sources, Dr. Black and nurse practitioner O'Hara,  (R. at 156, 188, 196-197, 200-201).  An x-ray of Plaintiff's left knee was unremarkable, and an x-ray of his right knee revealed only moderate degenerative joint disease (R. at 232, 238).  In both his Adult Function Report and in his testimony before the ALJ, Plaintiff reported pain in his legs and knees after "doing a lot of walking" (R. at 63, 279).  When asked by the ALJ what he did to relieve pain in his legs and knees, Plaintiff replied that he took one or two non-prescription aspirins (R. at 279).

Thus, based on the ALJ's decision and the evidence in the record, the Court finds the ALJ properly considered Plaintiff's complaints of bilateral knee pain and found that the evidence did not support that this was a disabling condition, either alone or in combination with Plaintiff's severe impairments, and would not significantly interfere with Plaintiff's ability to perform a significant range of light work.

### c.   The ALJ Properly Evaluated Plaintiff's Subjective Complaints When Assessing His Credibility

Plaintiff's third challenge to the ALJ's decision is that he failed to properly consider Plaintiff's subjective complaints when evaluating his credibility.  See Plaintiff's Brief, p. 13.  Plaintiff argues that his subjective complaints of pain are entitled to great weight as the complaints are supported by objective medical evidence.  Id.  Plaintiff further asserts that even if his subjective complaints of pain were unaccompanied by objective medical evidence, such complaints could serve as a basis for establishing disability.  Id.  Defendant argues that the ALJ properly exercised his authority to evaluate Plaintiff's credibility as required by 20 C.F.R. § 404.1529, and clarified by SSR 96-7p, and correctly found that Plaintiff's subjective complaints were not disabling to the extent alleged.  See Defendant's Brief, pp. 18-22.

An individual's statements about his or her condition, and the limitations caused by it, are not enough to establish disability.  See 20 C.F.R. § 404.1529. The Commissioner's regulations require that an ALJ consider a claimant's observable signs and laboratory findings, as well as reported symptoms, when determining whether or not a disability exists within the meaning of the regulations.  Id.

When an ALJ determines a claimant has an underlying physical and/or mental impairment(s) that could reasonably be expected to produce the reported pain or other symptoms, the ALJ must then evaluate the intensity, persistence, and limiting effects of the symptoms on the claimant's ability to do work-related activities.  See 20 C.F.R. § 404.1529(c); SSR 96-7p.

Plaintiff's medical evidence clearly establishes he has a severe combination of impairments including limitations in his left upper extremity from shoulder and rotator cuff surgeries, degenerative changes in his right elbow, chronic obstructive pulmonary disease (COPD) with a moderate breathing restriction, and prior cannabis use (R. at 19, 112-238).   Without re-stating all of the medical evidence discussed in Section (a) above, it is apparent that while Plaintiff suffers some functional limitations from his left shoulder and right elbow impairments, as well as his COPD, his insulin-dependent diabetes, high blood pressure, and patellofemoral arthritis do not impose serious functional limitations on Plaintiff's ability to engage in work-related activities, and thus are not severe impairments within the meaning of the Act.  Id.

After considering the evidence of record, the ALJ found that Plaintiff's underlying medical impairments could reasonably be expected to produce some of the symptoms claimed, but that his statements concerning the intensity, persistence, and limiting effects of his reported symptoms are not entirely credible as Plaintiff's claims are not fully supported by objective medical evidence (R. at 21).

In his brief, as well as in his testimony before the ALJ, Plaintiff claims he suffers constant and disabling pain in his left and right shoulders, elbows, legs and knees (R. at 266-293).  See Plaintiff's Brief, pp. 4-18.  However, his written testimony contained in his Adult Function Report, as well as numerous answers to the ALJ's questions, belie this claim (R. at 58-65, 252-294).  Plaintiff reported he lives alone and is independent in his activities of daily living (60-62, 280-281).

He cooks, cleans his apartment, and irons his clothes (R. at 61).  He goes outside and walks approximately six times per week.  Id.  He shops for food two to three times each month and each shopping trip takes approximately 45 minutes.  Id.  Plaintiff attends church several times a week and sings in the church choir (R. at 62, 281).  He told Dr. Shayevitz he is the assistant pastor at his church (R. at 164).  Such varied activities performed on a regular basis are inconsistent with Plaintiff's claim of total disability.

Plaintiff reported pain in his left shoulder if he reached out with his left arm, pain in his right shoulder because he used his right arm frequently, pain in his elbows when he bent them, pain in his knees and legs when he walked for a long time, and discomfort with sitting for a long time (R. at 63, 279, 290-291).  However, when the ALJ asked him what he did to relieve his pain, he stated that he took one or two over-the-counter aspirins (R. at 279).  The ALJ observed Plaintiff at the time of the hearing and noted that he walked into the hearing room without apparent difficulty, and appeared to sit comfortably for an hour before he stood up (R. at 25).

The ALJ also properly considered inconsistencies in Plaintiff's reported drug and alcohol use when assessing his credibility (R. at 25).  See 20 C.F.R. § 404.1529(c)(4).  In April 2006, Plaintiff told the ALJ he had not used marijuana for "almost like a year now," and that he had not had a problem with alcohol since his teen years (R. at 261-262).  He told Dr. Berton Shayevitz he had not used marijuana since 2001, and had never used cocaine (R. at 164).  Plaintiff told Dr. Myra Shayevitz he had stopped using alcohol in 2003, stopped smoking

marijuana in 2005, and last used cocaine in 2002 (R. at 224).  Such inconsistencies, at least with respect to his marijuana and cocaine use, reflect on the overall veracity of Plaintiff's statements.  See 20 C.F.R. § 404.1529(c)(4).

Despite Plaintiff's assertion that the ALJ did not correctly evaluate the medical evidence in the record when assessing the credibility of his statements regarding pain and limitations, it is clear to the Court from the ALJ's decision that he carefully examined and considered Plaintiff's claims in light of all of the evidence of record.  Indeed, the ALJ did not doubt Plaintiff experienced some pain and discomfort (R. at 25).  However, disability requires more than the ability to work without pain.  See Dumas v. Schweiker, 712 F. 2d 1545, 1552 (2d Cir. 1983).  Pain, either by itself or in combination with a claimant's documented impairments, must be of such intensity that it would preclude any substantial gainful activity.  Id.  The ALJ acknowledged Plaintiff was somewhat limited in his ability to push, pull and do overhead lifting with his non-dominant left extremity, but this severe impairment, along with his right elbow degenerative disease and COPD, did not significantly limit Plaintiff from performing the demands of a broad range of light work (R. at 27).

Thus, the Court finds the ALJ properly considered Plaintiff's symptoms, complaints of pain, and reported limitations, along with the medical and other evidence in the record, and further finds the totality of evidence does not substantiate Plaintiff's claims that his pain and other symptoms are disabling within the meaning of the Act.  Accordingly, the ALJ exercised his discretion to evaluate the credibility of Plaintiff's testimony, presented a summary of his

evaluation, and rendered an independent judgment regarding the extent of

Plaintiff's subjective complaints based on the objective medical and other

evidence (R. at 15-16).  See e.g. Mimms v. Sec'y of Health and Human Servs.,

750 F.2d 180, 196 (2d Cir. 1984).  Although the ALJ found Plaintiff's claims of

pain and limitations from his severe impairments to be not entirely credible, he

nevertheless determined Plaintiff could not return to his past relevant heavy work

as a maintenance worker and groundskeeper but could engage in a broad range

of light work (R. at 26-27).

### d. The ALJ Properly Evaluated the Opinion of State Agency Physician, Dr. Myra Shayevitz, When Assessing Plaintiff's Residual Functional Capacity

Plaintiff's fourth claim is that the ALJ failed to properly evaluate the opinion

of State agency physician, Dr. Myra Shayevitz, when assessing his residual

functional capacity.  See Plaintiff's Brief, pp. 13-15.  Specifically, Plaintiff argues

that because the ALJ found Dr. Shayevitz's opinion that Plaintiff was limited to a

range of work less than sedentary was based on inadequate clinical findings, he

was required to seek, *sua sponte*, additional information from Dr. Shayevitz.  Id.

Defendant argues that Dr. Shayevitz based her opinion of Plaintiff's limitations

primarily upon his subjective complaints rather than upon objective medical

findings, and thus the ALJ was correct in not giving the opinion great weight.

See Defendant's Brief, pp. 16-18.

Administrative law judges are not bound by any finding made by a State

agency medical consultant.  See 20 C.F.R. § 404.1527(f)(2)(i).  However, an ALJ

must consider the findings of a State agency medical consultant as opinion

evidence.  Id.  An ALJ will look at the findings, taking into account the extent of

the examination and how familiar the consultant is with the claimant's medical

records, how well supported and consistent the findings are in light of all of the

relevant evidence, and whether or not the State agency consultant is a specialist

in the area about which the opinion is proffered.  See 20 C.F.R. §

404.1527(f)(2)(ii).  If an ALJ does not give the opinions of a claimant's treating

physician controlling weight, he or she is required to explain the weight given to

the opinion of a State agency consultant.  Id.

In this matter, the ALJ requested a post-hearing internal medical

examination that would include breathing tests to document the severity of

Plaintiff's COPD, and x-rays of his knees (R. at 255-256).  The examination was

completed by Dr. Myra Shayevitz on July 31, 2006 (R. at 222-227).  Dr.

Shayevitz also completed a Medical Source Statement of Ability to Do Work-

Related Activities (R. at 228-231).  In her Medical Source Statement at the

conclusion of her examination notes, Dr. Shayevitz noted she was "impressed

with [Plaintiff's] sincerity" and that her opinion was predicated on the correctness

of the medical history that was given (R. at 227).  She opined in her Medical

Source Statement of Ability to Do Work-Related Activities that Plaintiff would be

unable to meet the physical demands of even sedentary work (R. at 227, 228-

231).

However, Dr. Shayevitz's Medical Source Statement and Medical Source

Statement of Ability to Do Work-Related Activities are as puzzling to the Court as

they must have been to the ALJ.  The findings from Plaintiff's physical

27

examination were essentially unremarkable, except for some limitations in the ranges of motion in his lumbar spine and left shoulder, and slightly decreased knee flexion (R. at 225-226).  His breathing test revealed only a moderate restriction, and the examiner noted Plaintiff put forth "poor effort not inhaling or exhaling correctly" (R. at 233).  The x-rays of Plaintiff's knees revealed only moderate degenerative joint disease in his right knee (R. at 232, 238).  Thus, it appeared to the ALJ, as it now appears to the Court, that Dr. Shayevitz crafted her restrictive Medical Source Statement of Ability to Do Work-Related Activities primarily upon her perception that Plaintiff was sincere and truthful in his recitation of his medical history and complaints, rather than upon objective findings that would lead to a diagnosis of a medically determinable impairment (R. at 227, 228-231).

The ALJ's decision reveals that he properly considered Dr. Shayevitz's opinion as required by the Commissioner's regulations, but gave the opinion little weight as it was neither consistent with Plaintiff's medical record, nor was it supported by Dr. Shayevitz's own examination of Plaintiff, or by the results of Plaintiff's medical tests (R. at 23-24).  See 20 C.F.R. § 404.1527(f)(2)(i-ii).  Further, an assessment of a claimant's credibility is reserved to the Commissioner, rather than to a treating or examining physician.  See 20 C.F.R. § 404.1529; SSR 96-7p.  Thus, the Court finds no error in the ALJ's rejection of Dr. Shayevitz's opinion as reflected in her Medical Source Statement, and her highly restrictive Medical Source Statement of Ability to Do Work-Related Activities (R. at 227, 228-231).

### e. The ALJ Properly Considered Plaintiff's Exertional and Non-Exertional Limitations and Correctly Used the Medical-Vocational Guidelines ("the Grids") When Determining There Are Significant Numbers of Jobs Available to Plaintiff in the Light Occupational Base

Plaintiff's final challenge to the ALJ's decision is that the Commissioner failed to meet his burden at step five of the sequential evaluation process by showing that even though Plaintiff is unable to return to his past relevant heavy work, there are significant numbers of jobs available to him in the light occupational base. See Plaintiff's Brief, pp. 18-23. Specifically, Plaintiff claims that the ALJ failed to consider his exertional and non-exertional limitations when determining he had the residual functional capacity to perform the requirements of a broad range of light work, and that the ALJ improperly relied on the Grids as a framework for his decision-making, rather than taking testimony from a vocational expert about the numbers and types of jobs that might be available to Plaintiff. Id. Defendant argues that the ALJ considered all of the evidence of Plaintiff's limitations when assessing his residual functional capacity, and reasonably concluded that the limitations did not significantly erode the numbers of jobs available to Plaintiff in the light occupational base. See Defendant's Brief, pp. 22-24.

After considering all of the evidence of record pertaining to a claimant's impairments, the ALJ is responsible for determining the claimant's residual functional capacity. See 20 C.F.R. § 404.1546. If a claimant is unable to perform his or her past relevant work, the burden shifts to the Commissioner at step five of the sequential evaluation to show that there is work the claimant can

do despite his or her limitations that exists in significant numbers in the national and local economies.  See 20 C.F.R. § 404.1560.

Plaintiff claims that when determining he could perform a broad range of light work, the ALJ failed to consider that he does not have good use of both hands, is unable to reach, handle, and raise and lower objects, and must avoid respiratory irritants.  See Plaintiff's Brief, pp. 18-21.  However, it is clear from the ALJ's decision that he did consider all of Plaintiff's limitations that he found would impact his ability to engage in substantial gainful activity at the level of light work (R. at 27).  As an example, the ALJ considered that Plaintiff is limited by his ability to perform overhead or repetitive reaching, lifting, pushing or pull with his non-dominant left upper extremity.  Id.  Yet there was scant medical evidence to suggest Plaintiff was significantly limited in the use of his hands or of his upper right extremity.  Thus, the ALJ found Plaintiff could use the hands of both of his upper extremities for handling and fingering, and was capable of lifting, carrying, pushing and pulling up to 20 pounds with his unimpaired and dominant right upper extremity with some assistance from his left (R. at 27).

With respect to Plaintiff's breathing problems, spirometry testing showed his FEV1 at 88 percent of predicted values, which is within the normal range (R. at 24, 234).  Thus, the ALJ properly concluded Plaintiff's moderate COPD, and his need to avoid respiratory irritants, would not significantly impact his ability to work in a wide range of jobs at the light exertional level.

The ALJ considered the limitations imposed by Plaintiff's impairments, and correctly determined they were primarily exertional, rather than non-exertional,

limitations (R. at 26-27).  He further found that the exertional limitations caused by Plaintiff's upper left extremity impairment had little effect on the light unskilled occupational base.  Based on all of the evidence of record, the ALJ determined Plaintiff's vocational capabilities fit within the criteria of the Grids, specifically the framework of Medical-Vocational Guideline Rule 202.17 (R. at 27).  The Court finds no error in the ALJ's determination that Plaintiff retained the residual functional capacity to perform a broad range of light work, or in his reliance upon the Grids, even absent the testimony of a vocational expert.

## Conclusion

After carefully examining the administrative record, the Court finds substantial evidence supports the ALJ's decision in this case, including the objective medical evidence and supported medical opinions.  It is clear to the Court that the ALJ thoroughly examined the record, afforded appropriate weight to all the medical evidence, including Plaintiff's treating physicians and the State agency medical consultants, and afforded Plaintiff's subjective claims of pain and limitations an appropriate weight when rendering his decision that Plaintiff is not disabled.  The Court finds no reversible error, and further finding that substantial evidence supports the ALJ's decision; the Court will grant Defendant's Motion for Judgment on the Pleadings and deny Plaintiff's motion seeking the same.

IT IS HEREBY ORDERED, that Defendant's Motion for Judgment on the Pleadings is GRANTED.

FURTHER, that Plaintiff's Motion for Judgment on the Pleadings is

DENIED.

FURTHER, that the Clerk of the Court is directed to take the

necessary steps to close this case.

SO ORDERED.

_____
Victor E. Bianchini
United States Magistrate Judge


Dated:      March 23, 2010
            Syracuse, New York